Good morning. May it please the Court, Counsel. My name is Steve Moore, and I represent the appellant, Reach Companies. There are two issues before the Court today. One is, did the District Court err in granting summary judgment when there was a fact issue as to the reason for non-performance of the contract? The second issue is whether attorney fees should have been awarded as foreseeable damages in this contract case. Let's start with the first issue. We have a classic fact issue in this case that precludes summary judgment. There is no question that Brands International ceased performance of the contract, and the question then is why. Why did it stop shipping product? Well, I thought it was pretty obvious they didn't get paid. Well, Your Honor, it's not that obvious because the conversation that happened, there was a telephone call on March 16th or 17th, and this is the key time of this case. This is the key facts in this case. There's this telephone call that happens. Mr. Rubinoff from Brands calls Mr. Tollefson from Reach Companies, and there are two competing versions of the conversation during that phone call, and that's where our fact issue comes from. Mr. Rubinoff testified that Brands was going to cease shipment because of Reach's failure to pay, and when asked in the deposition, well, how did Reach know what to pay? He said, well, we sent him invoices. So that's Brands' position. Then Reach's testimony was that no such conversation occurred during that telephone call. Okay, but it was, first off, it was payable on delivery, right? Well, it was COD, Your Honor, yes, but we get into an issue. Essentially the same thing. Well, we get into an issue, though, of what was owed. Well, weren't there proposals and per unit prices, and we know the number of units that were delivered, and it seems like pretty easy math to me. Well, we don't know what was delivered. That's the issue, Your Honor. The bills of lading, Mr. Rubinoff testified to this, were not exact. They were not, he said, his testimony exactly was they were more art than science. These bills of ladings were not correct, in other words. So we get into a situation, let's assume that Reach then relies on the bills of lading to pay Brands, and these bills of ladings are incorrect, and Reach then underpays. How do we know they're incorrect? Because Mr. Rubinoff testified to that. And how did, on what basis? Because he said they're not accurate. Well, you've got to have a basis for that. If they say one million units were delivered, he'd have to say, I went out and counted them, or I had my people count them, and there were only 750,000. Now I know why it's inaccurate. Right. Well, this isn't Just asserting it's inaccurate doesn't tell me anything. Well, we're not asserting that, Your Honor. That's Brands' testimony. Brands is saying that their own bills of lading are not accurate. Okay. So they cannot be relied upon. And then we get into a situation where, again, that conversation took place on March 16th or 17th. Then we have D.J. Rubinoff, her testimony. She is the general manager of Brands, and she sends an email to Reach on March 18th, a day or two after this conversation, and it's in Appendix 37. And she says, how much are we billing 5 Below? Now, 5 Below is the customer that the product is shipped to. So Brands itself, a day or two after this conversation where Mr. Rubinoff testifies that he said, you're not paying my invoices, so I'm cutting you off, a day or two later, Brands' general manager doesn't even know what to charge. And they're asking Reach, what do we bill for this? And they ask about what do we bill 5 Below? Reach writes back and says, you don't bill 5 Below, you bill Reach. So Brands itself does not know how much is owed on March 16th or 17th. So that's why we brought summary judgment in this scenario, Your Honor, because Mr. Rubinoff's testimony is not possible given the facts of the case. They don't know. And so how can you then say, well, you didn't pay me what you owe me, if you don't even know what you owe him? So by the time of the phone call, it's my understanding that there had already been three shipments and three missed payments. So why is the timing of the phone call, why does that create an issue of material fact? Because of what was said by, what was testified to by Reach as to what took place in that phone call. But by that time, there had already been three shipments. But no invoices. Do you agree that this is governed by the CISG? No, I don't. It wasn't pled. It was never mentioned until we get into very late in the case, in the amended initial disclosures is the first time the CISG is mentioned. And then on summary judgment, it comes in. They argue attorney fees under the CISG. So the answer is no, I would not agree with that. But back to this conversation. So if brands then, and this is the reason why it's a classic fact issue. Because if brands stop shipping because they don't have the product, and the testimony from Reach is that Mr. Rubinoff said, we can't ship product because someone stole the inventory. So those are the two competing versions of what happened in that conversation. And that's a jury call. Is it, did brands stop shipping because they didn't have the product, or is it because brands says Reach didn't pay me? And that is a decision for the jury to make. It's a material fact because the whole case hinges on that question. What happened in that conversation? And again, on the invoices, so we have March 18th, where DJ Rubinoff is wondering what to bill. And then we have the invoice isn't even generated until March 21st. And then that doesn't even go out to Reach until March 22nd. So nobody in this case knows what to charge until March 21st at the earliest. Well, why wouldn't you know what you owe? There wasn't agreed upon per unit price, right? Correct. And if it was delivered to your agent, why wouldn't your people say, how many units did you get? Well, Your Honor, it's to... And then multiply per unit times number of units and get a, this is what we owe. Okay. And send something. Again, and we go back, so we send something. If we're short, does brands have the same argument? Well, you breached it, we're not shipping you the product because you were And that brings the question, how does brands not know what it shipped and what to charge? Well, the judgment here was it was for the product that had been delivered, correct? That is correct. But it also dismissed our counterclaim, which was our breach of contract claim for failure to deliver the product. And that needs to be reversed because when you get into the conversation that happened, why did brands fail to deliver the product? They breached the contract by not sending us the product according to the testimony of reach. And that's because brands said, we don't have the product, somebody stole it. That has been a breach. So, it was the dismissal of our counterclaim. Well, in order for you to prevail, in order for your arguments to carry the day for your client, you've got to convince the court that this was something other than a cash on delivery arrangement and that that was never altered. Would you agree? Well, yes, but you get into what's cash on delivery? And I made this argument at the district court. It's the UPS driver comes up to my door and hands me a package and puts his hand out and says, well, you've got to pay for it. It's like, well, I don't know how much it is, nor does the UPS driver. And it turns out, nor does the company that's supplying the product know what is owed on that. So, we have a situation where nobody knows what's owed until March 22nd, which is after this conversation that takes place on March 16th or 17th and after the contract. And the district court said, well, you had a definite number of individual items that were delivered and there was a per item price agreed to. Doesn't that take care of your issue or your question there? Well, no, because we don't know exactly what was delivered. That's the problem with those bills of lading that were not accurate by Brandt's own testimony. And so, no, we cannot just do the simple math like that. I'd like to just pivot quickly to the attorney fees and then I want to reserve some time. The Zapata case is right on point on this. It's a Seventh Circuit case. It was the law in 2002 is when it was decided. It follows the American rule. Attorney fees are not part of the CISG. What the CISG talks about are a loss that is foreseeable at the time that the contract was made. So, this contract would have been made in 2020. We have a case from 2002 that says attorney fees are not recoverable under the CISG. They are not foreseeable losses. We follow the American rule. We have a case against an American company in an American court regarding a contract that was going to be completed in America and they are being sued, reached that is, under a complaint that does not mention attorney fees as a form of recoverable at the time that they entered into this contract. I'd like to reserve my remaining time for rebuttal. Very well. Thank you. Thank you. Good morning, Your Honor. May it please the Court. Counsel. This case comes down to whether REACH should get away with not paying for product that it admitted it received or whether brands should be made whole for the losses that it suffered as a consequence of REACH's contractual violations. The District Court found that brands should be made whole and this Court should affirm. I'd like to focus on just a handful of facts that the Court needs to resolve this appeal. There's no dispute that brands would deliver a specific quantity of hand sanitizer at specific prices according to its capacity. The parties weren't able to agree to a production schedule because of the exigencies of the then ongoing pandemic. Brands met its end of the bargain. It made three deliveries on March 11th, March 12th, and March 16th and it was never paid. It still hasn't been paid to this day. That's despite the fact that as the Court has observed, the transaction was governed by a COD payment term. That's an unambiguous term that everyone in the trade understands and it's defined universally as requiring payment upon delivery of product. Well, is there any truth to Mr. Moore's position that it was unclear how many units were delivered, that I guess the bills of lading were unclear and your client didn't know how many units were delivered? What's the story there? That's a purely abstract problem, Your Honor. There has been no error ever brought to anybody's attention. I mean, there's no discrepancy between the bills of lading and the unit prices reflected on there and the final invoices that REACH has refused to pay. I think, I could be wrong, but I think Mr. Moore said that your client conceded that the bills of lading were erroneous. That's incorrect, Your Honor. What Mr. Rubinoff testified to was that at the time, because of the pandemic, crafting bills of lading could at times be more hard than science, but he testified that there was no mistake in the bills of lading at issue here. And they reflected the number of units delivered. Correct, Your Honor. The totals reflected on the invoices that are at issue match exactly the product of multiplying the per unit prices, which never changed throughout the course of the transaction, and the quantities that were delivered. And REACH has never identified any discrepancy between them. Now, Mr. Rubinoff, Brands' sole owner, notified REACH that it would stop sending product, not surprisingly, due to the lack of payment on either March 16th or 17th. Brands then sent invoices memorializing what was due on March 22nd. REACH, on its own, without prompting, noted discrepancies, typographical errors in those invoices and it asked for revisions. Brands provided those the very next day. And despite several attempts at following up throughout the course of 2020, it was never paid and REACH fell off the radar. Until this lawsuit was initiated, that was the last time it had contact. Based on these few facts, the Court found that REACH had fundamentally violated the contract and that Brands was entitled to relief. REACH has offered two primary defenses here and before the District Court. The first is the idea that Brands was unable to meet its obligations because of a theft of component parts at its facility. As a legal matter, this has no relevance. REACH violated the contract the moment it had failed to make payment upon delivery. As an evidentiary matter, too, this doesn't comport with the undisputed facts. Brands produced copious amounts of hand sanitizer in March of 2020, including after the phone call with REACH. There was no shortage of component parts. Mr. Rubinoff testified that there was one theft in 2020, but it postdated any of its interactions with REACH that are at issue here. This theft is also not recorded in the business records of 5 Below, REACH's ultimate customer. REACH had many more purchase orders from 5 Below than the ones with Brands, and 5 Below kept meticulous records as to why some of those orders were canceled. None of those reflect an inability on Brands' part to produce product. In fact, they only reflect that there were fictitious restrictions at the U.S.-Canada border, which REACH's president, John Tollefson, and its vice president of sales, David Ehrlich, both testified were made up. They simply were not telling the truth when they communicated that to 5 Below. Counsel, looking at the district court's order, talking about how REACH could determine how much was owing for the shipments that were actually delivered, and as the court's talking about that, it comes down and it just kind of summarizes and says REACH could use simple arithmetic to calculate how much it owed Brands, which to me is saying that REACH could have just counted the product that was delivered and done the math. Do you agree with that? Yes, Your Honor, I do. Now, so is there something in the record, some contention by REACH, a conversation that REACH asserts occurred that would make that statement inaccurate or impossible? Not to my knowledge, Your Honor. It has not raised any discrepancy between the products of multiplying the per unit price and the quantities delivered and the final invoices. It has simply claimed that it needed an invoice to effectuate payment. And then I have one other question. On a cash on delivery transaction, is it your understanding that the law requires that payment to be made to the shipper that actually delivers? Or can payment then be made later, directly to the seller? REACH's President, Mr. Tollefson, testified that his understanding was that payment would be made as soon as the product was checked in at five months. Okay, well, I'm asking about the law here. What's the law of a cash on delivery sale? Does it require payment to the deliverer, to the shipper that stand in there having delivered the product? Or does it contemplate that the purchaser can write a check and send it to the seller? Payment should be made. And where would we go to find that, to find what the law is on a cash on delivery transaction? In this case, Your Honor, the district court relied on common dictionary definitions. And payment would be due upon delivery of the product to its ultimate destination. But to who? To the shipper? That's what I'm asking. But no one's, I think, answered that question, at least as far as I can tell here. In this case, it should have been made to Brands, Your Honor. Okay. And you say we look to the dictionary to determine that. We don't go to the UCC or some other body of law? It seems kind of odd that something as significant as that would be relegated to the dictionary. The CISG, Your Honor, if I could pivot to that briefly, speaks directly to this point. It has three articles that only support the use, the common usage of the COD term. Those are articles 54, 58, and 59. And those state that without any contrary agreement, payment is due upon delivery. The buyer must, without need for any request or compliance with formality, effectuate payment. And it places the onus on buyers to comply with any formalities that are needed for payment. In this case, there was not even an effort to comply with any formalities. Reach simply fell silent. And now that we've raised the CISG, Your Honor, there's no doubt that that's the law that applies here. It's a self-executing contract that applies to disputes between litigants that come from different contracting states. And that's easily satisfied here. Brands is a Canadian company and Reach is an American company, and there's no dispute over that. Go ahead. The only way to avoid the CISG's application is with an affirmative disclaimer saying that the CISG will not apply. And there's no contention that that occurred here. I'd like to turn to the attorney's fees question. So this is a question of first impression in the Eighth Circuit as to whether the prevailing party gets attorney's fees under the CISG. But the Seventh Circuit has said that they are not mandated. Why is the Seventh Circuit wrong? The Zapata decision, Your Honor, was wrongly decided for several reasons. It devoted only a few paragraphs of analysis to this issue. And it was caught up in a distinction that has its roots in purely domestic American law. And that's the distinction between substantive and procedural law. The Zapata court ignored that if the CISG, as a duly ratified treaty, requires payment of attorney's fees under its damages provisions, then it should supersede, by virtue of the supremacy clause, any domestic American law. Is there something specifically in the CISG about attorney's fees to the prevailing party? Not in so many words, Your Honor. And that was something that the Zapata court relied on in reaching its conclusion. But if it had engaged with the treaty, it would have found that attorney's fees are compensable losses. We can begin with the text of Article 74, which governs damages in CISG actions. It's a very broad damages provision. It defines damages as a sum that is equal to the loss suffered as a consequence of the breach. There is no indication in the text of that article that attorney's fees should be singled out for exclusion. If we take the Zapata court's logic to its extreme conclusion, then only lost profits would be recoverable under the CISG, because that's the only item of damage that it specifies. That's not the case, of course. Parties to CISG actions can recover expectancy damages, reliance damages, loss of goodwill, and so on. There is no basis for segregating attorney's fees from the rest of those compensable damages. The comments also from the secretariat to the convention, to the draft of what became Article 74, also indicate that damages should be construed flexibly, broadly, and as however may be best suited in a tribunal's view to the facts of a given case. Under your interpretation of the CISG, any American company entering into a contract that's under this treaty would be forfeiting the American rule and agreeing to attorney's fees? Not at all, Your Honor. The CISG in its Article 6 gives full freedom of contract to the parties. But they would have to specifically contract around it. Correct, Your Honor. And many litigants do frequently avoid the CISG entirely, or they may carve out attorney's fees or other remedies that they may feel are not subject to the contract. Even if the CISG does allow for attorney's fees, wasn't it waived here by a failure to plead attorney's fees? No, Your Honor. Under the law of this circuit, Brands gave plenty of notice that it would be seeking its attorney's fees. There were 46 days between the service of its amended disclosures indicating that it would seek its attorney's fees and the depositions of Brands' two principles. The invoices for Brands' attorney's fees were produced in conjunction with those disclosures. And despite having those in hand, Reach didn't pose any substantive questions at the deposition, despite even mentioning that the invoices were in its possession. Reach simply forfeited any ability to challenge attorney's fees, perhaps relying on the American rule. Well, doesn't Rule 9G, the Federal Rules of Civil Procedure, require that sort of specific damages like this be pled? The case is set in the briefs show, Your Honor, that this circuit, without a showing of prejudice, will allow whole remedies and claims to proceed to judgment, as long as the opponent or the party opposing that relief had an opportunity to contest it. And that opportunity was fully given here. Returning to the errors in Zapata's reasoning, the Secretariat's comments illustrate the full compensation principle, which is an animating principle behind the CISG. And it's something that even American courts have recognized. I'm referring here specifically to the Delkai case out of the Second Circuit. Zapata ignored the CISG's commandment in Article 7 that it should be interpreted with an eye towards promoting uniformity. Its reasoning, however, guts any chance of uniformity. It dramatically increases the risk of form shopping, and it ignores also that its substantive and procedural rule could lead to very divergent results, given that several items could be either procedural or substantive, depending on any given jurisdiction. Even here in the U.S., matters like prejudgment interests are sometimes considered procedural, as they are in Minnesota, and they're sometimes considered substantive, as they may be in New York. So the Zapata court's reasoning leaves litigants facing potential traps and definitely facing divergent results. I'd like to emphasize, too, that the rule of law that would be at issue here is a very narrow one. The CISG would need to apply, first of all, to any given dispute. The parties could not have disclaimed it generally or the availability of attorney's fees specifically, and any damages would need to be foreseeable, mitigated, and, as the district court did in this case, subject to scrutiny by both opponents and the court. So there would definitely be guardrails around both the general availability of attorney's fees, as well as their amount, ensuring that they would not be excessive. U.S. courts frequently apply domestic law that also results in claimant-only attorney's fees. This was something that the Zapata court paid very little attention to. And I see that my time is wrapping up, so I'd like to conclude with just two points. The first is that there's no genuine issue of material fact, including regarding the meaning of the COD term. Reach fundamentally breached the contract, and a trial would not result in any additional factual determinations.  It should be considered a recoverable item of damage that Brandt is entitled to. The treaty's text, its purpose, and the very limited applicability of such a rule all counts one favor of that, and it would bring the United States in line with other contracting states. Barring any questions from the court, that concludes my time. Seeing none, thank you, Mr. Wing. Thank you, Your Honor. Mr. Moore, rebuttal. Thank you, Your Honor. I'd like to start with Zapata. The language in the CISG is a loss that's foreseeable at the time that the contract is entered into. It's very similar to a consequential damages provision that's in the UCC. And the UCC, of course, does not allow for attorney fees under that consequential damages provision. So what's being talked about here, the language, is comparable to UCC consequential damages. The parties under the CIGS have to have reasonably foreseen attorney fees as damages at the time that they entered into the contract. And, Your Honor, you brought up Rule 9g. It's obvious from their pleadings, Brandt's pleadings, that they didn't consider attorney fees to be foreseeable at the time that the contract was entered into because they never pled relief for attorney fees. So Zapata, they can say it's wrongly decided. There are no cases that say it's wrongly decided. They don't rely on any case law. Seventh Circuit followed the American rule. As I said, we have an American company, contract that's performed in America, and the American rule should prevail. So Zapata should be followed in this case. I'd like to address the point that counsel made, so that we're trying to get away, or REACH is trying to get away without paying for the product. As I said earlier, we have a counterclaim, and that counterclaim is for consequential damages. It's to the damage that occurred because of Brandt's failure to supply the product to us. In the damages calculation, the cost of that product is subtracted from our damages calculation. So it's not like we're trying to get away without paying for the product. We have that figured into the damages calculation. There's talk about the March 11th, 12th, and 16th deliveries. Those were ship dates. Now, the product had to come across the Canadian border. That doesn't mean this product was delivered on the 11th or delivered on the 12th or even delivered on the 16th. Those are ship dates. So the timing then, again, on COD depends on when the product is actually delivered. And to Your Honour's question, do you pay the shipper, or who do you pay? Well, the shipper is a third party. It's not an employee of Brandt's. It's not an employee of Reach's that's shipping this product. The shipper has no idea. It's even supposed to collect payment in this case. So you get into situations where, who do you pay? And then how do you pay? Again, and where is that referenced? It's referenced in the invoices. The invoices have, on those invoices, remit payment to Brandt's. Here's the wiring instructions. No payment information was provided to Reach until those invoices arrived. And importantly on those invoices, where we were talking about, you know, it's simple math off of the bill of lading, the invoices that were created by Brandt's on March 21st that were shipped, that were then sent to Reach on March 22nd were incorrect. Brandt's couldn't figure out how much was owed based on simple arithmetic. Well, Mr. Wing says it was corrected the next day. No, it was corrected in April. April is when the, I apologize, it was corrected a day or two later. You're correct. But this is after March 16th or 17th. And what's important about this is Brandt's never told you. Is your position that if they didn't pay the shipper, then they never have to pay? No, that's not it at all, Your Honor. We get an invoice and we pay the invoice. But the invoice doesn't come until after Brandt's says, we're not going to ship you any more product. That's the key to this case. I see. Very well. Your time has expired. Thank you. Thank you.